IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

DAVID ESTRADA,                        §
Institutional ID No. 02252466         §
                                      §
              Plaintiff,              §
                                      §
v.                                    §        Civil Action No. 1:22-CV-00073-BU
                                      §
ROBERT W. NORTON, *et al.*,           §
                                      §
              Defendants.             §
                                      §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff David Estrada, an inmate incarcerated by the Texas Department of Criminal

Justice (TDCJ), brings this action under 42 U.S.C. § 1983 against various TDCJ employ-

ees. Dkt. No. 2. Two of these defendants—Lieutenant Robert W. Norton and Corrections

Officer Miguel Langdon—now bring a Motion for Summary Judgment on the basis of

qualified immunity. Dkt. No. 67.

For the reasons below, the undersigned RECOMMENDS that the Court GRANT

Defendants's Motion for Summary Judgment. The undersigned also RECOMMENDS that

Estrada's claims against the remaining Defendants be DISMISSED.

## I. JURISDICTION

Estrada brings this action under 42 U.S.C. § 1983, providing the Court with subject-

matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Venue is proper in the Northern

District of Texas, Abilene Division, because the events giving rise to Estrada's claims

1

occurred at TDCJ's Robertson Unit in Jones County, Texas. *See* Dkt. No. 1. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after Senior United States District Court Judge Sam R. Cummings transferred Estrada's case to the undersigned for screening and pretrial management.[1] Dkt. No. 7; 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL BACKGROUND

Estrada was transferred out of the TDCJ Robertson Unit in April 2025 and is currently housed at the Montford Unit in Lubbock; Estrada was still housed in the Robertson Unit when the events in this case occurred. Dkt. Nos. 2 at 3, 64, 67 at 2, 75. On October 5, 2020, Estrada was involved in a fight with his cellmate, Willie Brown. Dkt. No. 29 at 7. TDCJ staff used chemical spray to break up the fight; both Estrada and Brown were then restrained and prepared to be escorted to medical for a use-of-force evaluation. Dkt. Nos. 29 at 7–8, 69 at 8. Norton arrived on the scene shortly after the fight had ended. Dkt. No. 69 at 10.

While waiting to be escorted to medical, Estrada jumped over his arm restraints, moving his hands from his back to his front. Dkt. Nos. 29 at 8, 69 at 8. The parties dispute his reasons for doing so.[2] Despite being sprayed again with chemical agent, he refused to return his hands to behind his back. Dkt. No. 69 at 8. Norton left to assemble a five-man

---

[1] This case was later reassigned from Senior United States District Judge Sam R. Cummings to United States District Judge James Wesley Hendrix under Special Order 3-355.

[2] Estrada alleges that he jumped over his restraints to wipe away the chemical residue from the prior use of chemical agent. Dkt. No. 29 at 8, 15. The Defendants instead allege that Estrada was tampering with his restraints to access a piece of metal, which they believed was a "blade" he could use to harm himself. Dkt. Nos. 67 at 6, 69 at 8.

team in response; Defendant Langdon was one of the members of the five-man team. *Id.* at 10. When Norton returned with the team, Estrada complied with his orders to present his hands so the arm restraints could be resecured. *Id.* at 8, 10.

Estrada was then taken to medical for the use-of-force screening; when asked if he sustained any injuries, Estrada said only that "it just burns."[3] *Id.* at 11. Estrada does not base any of his constitutional claims on this prior use of force. Dkt. No. 29 at 7.

After being screened for injuries, Estrada was escorted by Norton and the five-man team to a holding cell in Building 11 for a strip search. Dkt. Nos. 29 at 9–10, 69 at 11. Estrada was ordered to present his restraints for removal and remove his clothes, and complied with these instructions. Dkt. Nos. 29 at 9–10, 69 at 11. The parties dispute what happened as the strip search continued, so the facts as alleged by each will be described separately.

### 1.  Plaintiff's Account

Estrada alleges that he was fully compliant with the instructions he was given throughout the strip search. Dkt. No. 29 at 10. Despite his compliance, the officers repeated their instructions several times, allegedly because they were "looking for a reason to spray [him] again." *Id.* at 10–12. When Estrada had his back turned to the officers and was complying with their instruction to spread his buttocks, Norton sprayed Estrada with chemical agent. *Id.* at 12. Soon afterwards, Estrada moved towards the toilet and used the water to wash the chemical residue out of his eyes. *Id.* at 12. Without giving him a warning, Norton

---

[3] Estrada later clarified that he was referring to the effect the chemical agent had on his eyes. Dkt. No. 29 at 8.

sprayed Estrada a second time. *Id.* at 15, 17.

While Estrada was wiping the chemicals from his face, he noticed that the officers were still outside his cell door. *Id.* at 18. When he approached the door to see what they were doing, the door opened and the five-man team entered the cell. *Id.* at 18–19. Estrada then ran to the back of his cell and sat down on the bunk; the lead member of the five-man team followed him in and struck him with his shield. *Id.* at 19. Estrada alleges that the five-man team beat him up while he was on the bed, "balled up, just receiving every punch from them." *Id.* at 19–20. Estrada was struck on his head, back, arms, and legs by the officers. *Id.* at 23. While Estrada doesn't know who specifically struck him, he claims that "each one of them got to at least lay in . . . three to five punches." *Id.* at 20. The officers did not stop until "they seen [sic] that I wasn't fighting back." *Id.* at 21–22.

The five-man team then turned Estrada around and threw him to the floor; his face struck the ground and his nose was bloodied. *Id.* at 22, 37. Each officer grabbed an arm and a leg to hold him down. *Id.* at 21. Norton then commented that "he's resisting arrest," and grabbed his leg. *Id.* In the process of restraining him, one of the officers twisted his left arm out and fractured it. *Id.* at 20–21. Estrada screamed in pain and "made them stop." *Id.* at 21. The officers finally applied the arm and leg cuffs, but shortly afterwards they "took them off and they ran out of the cell." *Id.* at 25.

After the five-man team left, Estrada asked for medical attention for his arm. *Id.* at 27. He was taken to Hendrick Medical Center three or four hours later, where his arm was treated. *Id.* at 27–28.

### 2.  Defendants's Account

4

The Defendants allege that, once Estrada was secured in Building 11, he initially complied by handing over his restraints and clothes. Dkt. No. 69 at 11. However, Estrada did not comply with the instruction to run his finger through his gum line, and the officers restarted the strip search procedure. *Id.* During the second attempt, Estrada refused to spread his buttocks despite being ordered to. *Id.* When Estrada refused to follow Lieutenant Hunnel's instructions, Norton sprayed Estrada with chemical agent. *Id.*

While the officers waited for the chemical agent to take effect, Estrada approached the toilet and flushed it. *Id.* Norton, suspecting Estrada was attempting to flush contraband, warned him that the five-man team would be deployed, but Estrada continued to flush. *Id.* Norton then applied a second burst of chemical agent to prevent Estrada from destroying contraband. *Id.* Despite being ordered to step away from the toilet, Estrada refused to do so; Lt. Hunnel then signaled for the cell door to be opened. *Id.* Norton instructed the five-man team to prepare for entry, and the team entered the cell as the door opened. *Id.*

As the team entered, Estrada struck the lead man's shield with his fist. *Id.* The five-man team struggled with Estrada, who continued to resist the officers, but they eventually managed to get him prone on the ground. *Id.* As he was being moved to the ground, one of the team members, Defendant Melton, landed on Estrada's arm and broke it. *Id.* at 5. Only then did Estrada stop resisting the officers. *Id.* at 11. The officers restrained Estrada's arms and legs and visually inspected him for contraband; finding none, his leg restraints were removed and the five-man team exited the cell. *Id.*

Norton called for medical to evaluate Estrada, but during the use of force their medical representative, Melissa Leija, had left the scene due to the effects of the chemical agent.

5

*Id.* at 10–11. Once a replacement medical representative arrived, Estrada was screened for injuries; Estrada notified them of his broken arm, and the medical staff noted a slight abrasion on his chest. *Id.* at 11–12. Norton also asked Estrada if he sustained any injuries, and was told that "yall broke my arm." *Id.* at 12. The five-man team was sent away from the scene; Norton then provided Estrada decontamination instructions and resumed his normal operations. *Id.* at 11.

### III. THE PARTIES

Estrada filed suit on May 26, 2022. Dkt. No. 2. Estrada's action was transferred to the undersigned for screening, Dkt. No. 6, and Estrada later consented to the undersigned exercising jurisdiction. Dkt. No. 10. The Court then held an evidentiary hearing under *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985), where Estrada appeared via teleconference and testified under oath. Dkt. No. 29.

At the screening stage, the Court dismissed all of Estrada's claims except for his excessive force claims against Defendants Norton, Broadus, Langdon, Melton, Delatorre, Ramos, and Puga. Dkt. No. 30. However, the court summonses were returned unexecuted for all defendants except Norton and Langdon. Dkt. Nos. 45–49. After the Court exhausted its ability to locate and serve the unserved defendants, Estrada was ordered in January 2025 to provide the needed addresses to the Court. Dkt. No. 50. To date, Estrada has been unable to provide updated addresses for the unserved defendants. Dkt. Nos. 51, 54, 60.

Defendants Norton and Langdon now assert that they are entitled to qualified immunity and seek summary judgment on that basis. Dkt. No. 67. Estrada has filed a response

asserting that the defendants's Motion for Summary Judgment should be denied.[4] Dkt. No. 70.

## IV.  LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). Typically, the moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). The moving party may "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a movant asserts a qualified immunity defense, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). "Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008) (citations

---

[4] In Estrada's Response, he also asks for "this Court to dismiss Defendants allegations with prejudice[.]" Dkt. No. 70 at 3. This request was docketed as a Motion to Dismiss filed by Estrada. Dkt. No. 71. The defendants have not filed any claims against Estrada for the Court to dismiss; thus, the undersigned recommends that this motion be DENIED. Estrada may instead be asking the Court to deny the defendants's motion for summary judgment; the undersigned recommends that the Court instead grant the motion for summary judgment, for the reasons discussed in this FCR.

omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Movants are not required "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). Instead, "once properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). This means the plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

Whether the movant violated the plaintiff's constitutional rights is a question of fact. When evaluating the facts of the case, courts construe the facts alleged in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). The factual allegations in a verified complaint are treated as evidence in the same way as a sworn affidavit. *Stauffer v. Gearhart*, 741 F.3d 574 (5th Cir. 2014) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)). However, when record evidence—such as images, audio, or video recordings—"utterly discredit[s]" a party's version of events such that "no reasonable jury could have believed [them]," the court should not adopt that party's characterization of the facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Garcia v. Orta*, 47 F.4th 343, 350–51 (5th Cir. 2022).

By contrast, whether the plaintiff's rights were clearly established is a question of

law. "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, the plaintiff may "identify a case—usually, a body of relevant case law—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (internal quotation marks omitted). Second, the plaintiff may demonstrate that the violation at issue is so obvious that case law is not required to put an officer on notice that their conduct was wrong. *Joseph*, 981 F.3d at 330. However, an officer who violates clearly established law is still entitled to qualified immunity if their conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

The first method of demonstrating clearly established law "do[es] not require a case directly on point," so long as prior, factually distinct cases give "reasonable warnings that the conduct at issue violated constitutional rights." *Batyukova*, 994 F.3d at 726; *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013)). But the existence of the right must be "sufficiently clear" such that every reasonable officer would have understood the challenged conduct to be unlawful. *Batyukova*, 994 F.3d at 726 (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)) (internal quotation marks omitted). "Distinctions between cases are thus relevant only if they make the applicability of prior precedent unclear." *Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023). In addition, prior cases cannot "define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). A rule is too

9

general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)).

The second method of demonstrating clearly established law applies in the rare "obvious case" where "the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590) (cleaned up). In these obvious cases, "general standards 'can "clearly establish" the answer, even without a body of relevant case law.'" *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). But the "standard for obviousness is sky high[.]" *Joseph*, 981 F.3d at 338.

While clearly established law is typically a question of law, there may be factual disputes which are relevant to the determination. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024). Ultimately, to defeat an assertion of qualified immunity, the plaintiff "has the burden to point out clearly established law [and] rais[e] a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021).

## V. ANALYSIS

Here, Estrada alleges in his pleadings that Defendants Norton and Langdon violated his constitutional rights. Estrada claims that they used excessive force that constituted cruel and unusual punishment under the Eighth Amendment.[5]

---

[5] The facts in Estrada's pleadings could be construed as raising bystander liability claims against Norton and Langdon, but Estrada has failed to raise these claims in his filings. When the undersigned screened Estrada's claims, the Complaint and *Spears* hearing only raised excessive force and deliberate indifference to medical needs claims; of these, only the excessive force claims survived screening. Dkt. No. 30. In Estrada's answer to the defendants's motion for summary judgment, he seeks to bring new bystander

10

### 1. Excessive Force Claims

The Eighth Amendment prohibits prison officials from using excessive force against convicted inmates. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Byrd v. Harrell*, 48 F.4th 343, 347 (5th Cir. 2022) (quoting *Hudson*, 503 U.S. at 7). This assessment of the prison official's "subjective intent" is made "by reference to the well-known *Hudson* factors." *Byrd*, 48 F.4th at 347 (quoting *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016)). These factors include, but are not limited to, the following: "(1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." *Bourne v. Gunnels*, 921 F.3d 484, 491 (5th Cir. 2019) (cleaned up).

An assessment of the prison official's intent necessarily requires consideration of the totality of the circumstances, particularly the "progression of events" preceding the use of force. *Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (per curiam). While it is theoretically possible for one factor to "overshadow the others" such that it is dispositive, this is rarely the case. *Id.* There is no requirement that a prisoner suffer significant injury to raise a successful claim; the assessment turns on the nature of the force, rather than the

---

claims against Norton. Dkt. No. 70 at 1. The undersigned construes this as a motion for leave to supplement his complaint; because Estrada's motion was not filed until well after judicial screening concluded, the defendants filed their answer, and the defendants moved for summary judgment, the undersigned recommends that the Court DENY this motion.

extent of the injury. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). However, the Eighth Amendment does not apply to "*de minimis* uses of physical force," unless it is "of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley v. Albers* 475 U.S. 312, 327 (1991)).

Here, Estrada alleges that Norton assaulted him with chemical agent twice, then held down his leg as part of the five-man team. Dkt. No. 29 at 15–17, 21. Estrada also alleges that Langdon, as part of the five-man team, beat him in his cell and forced him to the ground while he was not a threat to the prison officers. Dkt. Nos. 2 at 3, 29 at 18–20.[6] For each alleged use of excessive force, the undersigned will assess (1) whether Estrada has raised a material fact issue that the force used was excessive based on the *Hudson* factors, and (2) whether the alleged misconduct violated clearly established law.

A. *Norton's Use of Chemical Agent*

Estrada alleges that Norton first used the chemical spray on him during the strip search, despite Estrada complying with all instructions he was given. Dkt. No. 29 at 12. When Estrada went to wash the chemical agent out of his eyes at the toilet, he alleges that he was sprayed a second time. *Id.* at 15, 17. Courts have discretion to address either the factual or legal prong of the qualified immunity analysis first. *Pearson v. Callahan*, 555

---

[6] In his complaint, Estrada could only identify Defendant Broadus as part of the five-man team. Dkt. No. 2 at 3. Langdon was later identified through authenticated prison records. Dkt. No. 30. Estrada suggests that one of the unknown team members (which would include Langdon) could have broken his arm, but recalls Defendant Melton admitting that "he was involved in that incident . . . but never meant to break [Estrada's] arm.". Dkt. No. 29 at 28–29.

This aligns with the use-of-force records, which indicate that Melton was the one holding Estrada's arm when it broke. Dkt. No. 69 at 5. Estrada makes no other factual allegations against Langdon individually; only his general claims against Langdon as a member of the five-man team that assaulted him remain to be evaluated.

U.S. 223, 236 (2009). Here, the undersigned finds it unnecessary to determine if Norton's conduct factually violated Estrada's rights because, at the time the incident occurred, Estrada's rights were not clearly established as a matter of law.

The Supreme Court in *Wilkins v. Gaddy* clarified the "core judicial inquiry" outlined in *Hudson*; there, the Supreme Court shifts the judicial inquiry to focus on "the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 9). Force is trivial and "exclude[d] from constitutional recognition" if it is "*de minimis* . . . provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9–10). Thus, a use of force violates clearly established law if, under said law, the force used (1) was nontrivial, meaning it was either non *de minimis* or repugnant to the conscience of mankind, *and* (2) was applied maliciously and sadistically to cause harm. Both nontriviality *and* maliciousness must be clearly established by law. In this case, Estrada fails to show that Norton's use of chemical spray was clearly established as nontrivial.

Here, it was not clearly established that Norton's use of chemical spray was non-*de minimis*. As of 2020, several Fifth Circuit cases had concluded that chemical spray and analogous uses of force were *de minimis*. *See Thomas v. Comstock*, 222 F. App'x 439, 442 (5th Cir. 2007) (stating that chemical spray is a *de minimis* use of force); *McCoy v. Alamu*, 950 F.3d 226, 232–34 (5th Cir. 2020) (holding that it was not clearly established that "an

isolated, single use of pepper spray" went beyond a *de minimis* use of force);[7] *see also Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993) (holding that use of fire extinguisher on prison inmate was *de minimis* force). In light of these cases, it could not have been clearly established that Norton's use of two bursts of chemical spray exceeded a *de minimis* use of force.

Because Norton's use of chemical spray was not clearly established as non-*de minimis*, it violated clearly established law only if it was clearly repugnant to the conscience of mankind. What constitutes a "repugnant" use of force is itself a rarely explored concept in the Fifth Circuit. *Gomez v. Chandler*, 163 F.3d 921, 924 n.4 (5th Cir. 1999) (declining to resolve when *de minimis* uses of force are repugnant to mankind); *Brown v. Lippard*, 472 F.3d 384, 386 n.1 (5th Cir. 2006) (stating that cases like *Gomez v. Chandler* left "ambiguities" as to when a use of force satisfies the "repugnant to the conscience test"). The Supreme Court has noted that it has "held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The concept of repugnancy thus presents a moving target that is difficult to clearly establish in general or specific terms.

Here, existing case law in 2020 did not clearly establish that Norton's conduct was repugnant. Prior courts have held that the use of chemical spray in prison is not repugnant

---

[7] The Supreme Court later vacated the Fifth Circuit's judgment in *McCoy* and remanded for reconsideration. *McCoy v. Alamu*, 141 S. Ct. 1364 (2021). However, the Fifth Circuit's *McCoy* holding had not yet been vacated in October 2020 when Norton's conduct occurred.

when justified by prisoner misconduct or alleviated by prompt medical attention or washing.[8] *Thomas v. Comstock*, 222 F. App'x 439, 442 (5th Cir. 2007) (holding single use of chemical spray not repugnant when given prior warning and allowed to wash immediately afterwards); *see also Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (citing several circuit cases holding use of chemical spray not repugnant when done to subdue noncompliant prisoners).

However, the Supreme Court has stated that *de minimis* force that "may later seem unnecessary in the peace of a judge's chambers" is unconstitutional only when it is *also* repugnant—indicating that the necessity of the force is not dispositive of its repugnancy. *Hudson*, 503 U.S. at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Similarly, the court in *Thomas* did not explicitly hold that the guard's conduct would have been repugnant had the prisoner not been allowed to immediately wash himself. Here, Norton alleges that he provided Estrada decontamination instructions after the use of force, Dkt. No. 69 at 12, and Estrada does not contest this claim.[9] The factual distinctions between *Thomas* and the present case make the "applicability of [*Thomas*] unclear." *Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023).[10] The undersigned is therefore not

---

[8] This logic closely mirrors two *Hudson* factors—the need for the force and efforts to temper severity—which are used to evaluate if the force was applied maliciously and sadistically. *Hudson*, 503 U.S. at 7 (1992). Defining repugnancy with the same factors as maliciousness risks negating the *de minimis* force element; most malicious uses of force would also be deemed repugnant to mankind, and thus actionable regardless of whether it was *de minimis*. Regardless, the undersigned is tasked with applying the law as it existed in 2020.

[9] Estrada does allege that he was not given medical attention for his arm until a couple of hours after the use of force. Dkt. No. 29 at 27–28. However, he does not claim that he was not given decontamination instructions.

[10] In *Thomas*, the prisoner did not pose a threat requiring prolonged examination, and submitted to restraints immediately after being sprayed. 222 F. App'x at 4401–41. Thus, it was reasonable for the officer to immediately allow the prisoner to wash. By contrast, Estrada was in the middle of a strip search when he was

15

persuaded that *Thomas* definitively establishes Norton's conduct as repugnant.

Estrada also cannot rely on the obviousness exception to demonstrate that his rights were clearly established. General standards can clearly define the law in obvious cases if there is no "body of relevant case law" that "address[es] similar circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Here, there is a body of case law that discusses the constitutionality of chemical spray in prisons and considers chemical spray a *de minimis* use of force. *Thomas*, 222 F. App'x at 442; *McCoy*, 950 F.3d at 232–34. Even accepting as true that Estrada was complying with the strip search when Norton used the chemical spray, the undersigned is not persuaded that Norton's conduct was so clearly unlawful or repugnant that it satisfies the "sky-high" standard for obviousness. *Joseph*, 981 F.3d at 338.

Because it was not clearly established that use of the chemical spray was non-*de minimis* or repugnant to the conscience of mankind, clearly established law in 2020 did not put Norton on notice that his use of force was nontrivial, and thus actionable under the Eight Amendment. Thus, the undersigned does not need to evaluate whether Norton's conduct was malicious and sadistic under clearly established law, or whether the facts as alleged by Estrada raise a fact issue that Norton acted maliciously.[11]

---

sprayed. Dkt. No. 29. Under the circumstances, he could not be taken to the infirmary or allowed to wash until the strip search had concluded. Estrada nonetheless attempted to wash during the strip search, which led to use of a five-man team. Dkt. No. 29 at 18–19. At this point, Norton's focus reasonably shifted to seeking medical assessment of Estrada's broken arm, rather than resolving the use of the chemical spray.

[11] The undersigned concludes that it was clearly established that Norton's first use of chemical spray, but not his second, was malicious and sadistic. The court in *McCoy* held that an officer who sprayed an inmate in his cell "for no reason at all," was "motivated by a bare desire to harm [the plaintiff]," citing several unpublished decisions that found a violation when a "restrained or subdued person is subjected to the use of force." 950 F.3d at 231–32. However, the court also noted that chemical spray could be used to "subdue

B. *Langdon's Assault on Estrada*

Estrada also alleges that Langdon, as part of the five-man team, assaulted him in his cell when he was not resisting and "was never being a threat towards officers." Dkt. No. 2 at 3. Specifically, Estrada alleges that each member of the five-man team got "three to five punches" on him. Dkt. No. 29 at 20. Estrada claims that he did not resist the officers, but instead retreated to the bed in the back of the cell, sat down, and "balled up, just receiving every punch from them." Dkt. No. 29 at 19–20.

Viewing Estrada's allegations in the light most favorable to him, he has nonetheless failed to raise a fact issue that Langdon's conduct was malicious and sadistic. To determine if the facts alleged indicate that Langdon's mental state was unlawful, the undersigned must look to the five *Hudson* factors. *Byrd v. Harrell*, 48 F.4th 343, 347 (5th Cir. 2022). The first *Hudson* factor weighs against Estrada, as he does not allege any injuries that arose as a result of his beating. Aside from his arm, which was not broken until after the alleged beating, his only other injuries were a "slight abrasion on [Estrada's] chest" and a bloodied nose. Dkt. Nos. 29 at 37, 69 at 12. However, Estrada does not claim that the five-man team struck his chest; instead, he claims he was punched on his head, back, arms, and legs. Dkt. No. 29 at 23. The undersigned is not persuaded that a bloody nose alone is a sufficiently

---

recalcitrant prisoners" without violating the Constitution *Id.* at 231 (quoting *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975)).

Here, Estrada alleges that he was first sprayed while complying with Norton's instructions and had his back turned. Dkt. No. 29 at 10–12. This is sufficiently analogous to the plaintiff in *McCoy*, who was unconstitutionally sprayed "for no reason at all," to have given Norton fair notice. 950 F.3d at 231–32. However, Estrada concedes that he was washing himself with the toilet when he was sprayed the second time. Dkt. No. 29 at 15, 18–19. In the context of a strip search, this conduct is sufficiently disruptive for prior cases to not clearly establish Norton's act as unlawful. Instead, the second use of force is more analogous to an effort to "subdue [a] recalcitrant prisoner[.]" *McCoy*, 950 F.3d at 231.

serious injury for this factor to weigh in Estrada's favor. *See Siglar v. Hightower*, 112 F.3d 191, 193–94 (5th Cir. 1997) (concluding that a bruised ear was a *de minimis* injury).

The second factor also weighs against Estrada because he admits that the officers needed to use force. Estrada concedes that, although he was merely balled up in the back of his cell, the five-man team would need to use some amount of force to un-ball and re-strain him. Dkt. No. 29 at 38. However, the third factor weighs narrowly in Estrada's favor. Langdon and the officers did not injure Estrada, suggesting that the force they used was proportional; however, it may still have been unnecessary for each officer to strike Estrada multiple times in order to un-ball him. While some force was necessary, Estrada has raised a fact issue that the force used was disproportional to the need.

The fourth factor weighs narrowly against Estrada. Even if Estrada was not resisting the five-man team, Langdon and the other officers could have believed that he was in the heat of the moment. Estrada's own testimony indicates that the officers stopped hitting him once "they seen [sic] that [he] wasn't fighting back." Dkt. No. 29 at 21–22. Thus, the facts Estrada describes shows that Langdon and the other officers likely believed he was resist-ing, at least at first. This conclusion is bolstered once the "progression of events" preceding the use of force is taken into account.[12] *Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (per curiam).

---

[12] Before the team was deployed, Estrada had been in a fight with his cellmate, been sprayed with chemical agent to make him stop, jumped over his restraints while waiting for medical transfer, and begun washing himself in the toilet during a strip search. Dkt. No. 29 at 7–8, 15. Estrada was also still using the toilet to wash himself just before the team was deployed, indicating that he did not step away as he was told to. Dkt. No. 29 at 18–19. In this context, it becomes even more likely that the officers subjectively interpreted Estrada's defensive stance as posing a potential threat.

The fifth factor also weighs against Estrada, as the officers tempered their use of force both before and after the struggle. The officers attempted lesser forms of force, such as chemical spray, to prevent Estrada from washing in the toilet during the strip search; Estrada concedes he was still doing so when the five-man team was deployed. Dkt. No. 29 at 15, 18–19. As noted above, Estrada also concedes that the five-man team stopped hitting him once they saw that he was not resisting and instead moved him to the ground to restrain him. Dkt. No. 29 at 21–22.

Of the five *Hudson* factors, only one weighs in Estrada's favor. Even if the undersigned were to construe the fourth factor in Estrada's favor, contrary to the facts as alleged by Estrada, he would still be supported by only two of the five *Hudson* factors. The undersigned therefore concludes that Estrada has not raised a fact issue that Langdon's conduct was malicious or sadistic.

### C.  *Norton and Langdon Holding Down Estrada*

Estrada alleges that Norton and Langdon both held him down as part of the five-man team. Dkt. No. 29 at 21. When Estrada was first thrown down, his face struck the ground and his nose was bloodied. *Id.* at 22, 37. While Estrada was being held down, one of the other officers twisted his arm back and broke it. *Id.* at 20–21. Estrada alleges that because his arms were already behind his back, it was not necessary to twist his arm to secure him. *Id.* at 21, 30–31. TDCJ medical staff also noted a slight abrasion on his chest after the use of force. Dkt. No. 69 at 11–12.

Viewing these allegations in a light most favorable to Estrada, he has failed to raise a fact issue that Norton or Langdon's conduct was malicious or sadistic. The first *Hudson*

factor weighs against Estrada. Estrada's testimony and the defendants's incident report both agree that Melton was the officer who broke his arm, not Norton or Langdon. Dkt. Nos. 29 at 28–29, 69 at 5. The only other injuries Estrada suffered were a bloodied nose and an abrasion on his chest. Dkt. Nos. 29 at 37, 69 at 12. As before, the undersigned is not persuaded that these injuries are sufficiently serious for the first *Hudson* factor to weigh in his favor. *See Siglar*, 112 F.3d at 193–94 (concluding that a bruised ear was a *de minimis* injury).

The second and third factors also weigh against Estrada. Norton and Langdon reasonably believed that Estrada was attempting to dispose of contraband in the cell toilet, and Estrada's testimony indicates he was still washing himself just before the five-man team entered. Dkt. No. 29 at 18–19. In this context, it was reasonably necessary for the defendants to hold down Estrada in order to restrain him and perform a visual search, and the force they each applied was proportional to that need. Estrada notes that Norton shook his leg while holding him down, *Id.* at 21, but as this force produced no injury it does not alter the undersigned's conclusion that the force used was proportional to the need.

The fourth *Hudson* factor weighs narrowly in Estrada's favor. Even though the defendants reasonably believed that Estrada was trying to dispose of contraband, his conduct would not have posed a clear threat to them or to other inmates. However. the fifth factor weighs against Estrada; as discussed, the five-man team was not deployed until after chemical spray failed to produce compliance. Dkt. No. 29 at 15, 18–19. The officers also tempered their use of force after the fact by providing Estrada a medical screening as soon as

possible.[13] Dkt. No. 29 at 11–12.

Of the five *Hudson* factors, only one clearly weighs in Estrada's favor; the remaining four support the defendants to varying degrees. The undersigned therefore concludes that Estrada has not raised a fact issue that the Norton and Langdon's participation in the five-man team was malicious or sadistic.

### D. Conclusion

Estrada has failed to demonstrate that Norton violated clearly established law by using the chemical spray on him. Estrada has also failed to raise a fact issue that either Langdon or Norton's role in the ensuing struggle violated his constitutional rights. For these reasons, the undersigned finds that Defendants Norton and Langdon are entitled to qualified immunity against Estrada's excessive force claims.

### 2. Claims Against the Unserved Defendants

While Defendants Norton and Langdon did not raise this issue in their motion, the undersigned also believes it is appropriate to address Estrada's claims against the remaining defendants. In November 2024, the Court attempted to serve Defendants Broadus, Melton, Delatorre, Ramos, and Puga at their last known addresses, as provided by the Office of the Attorney General (OAG). Dkt. No. 43. These court summonses were returned as unexecuted. Dkt. Nos. 45–49. The Court then ordered Estrada to provide updated addresses for these defendants by April 28, 2025. Dkt. No. 60. Estrada has not done so; he explains that,

---

[13] While Estrada's broken arm was not treated for several hours, Dkt. No. 29 at 27–28, neither Norton nor Langdon's use of force were the cause of his arm injury. Thus, any delay in treating Estrada's arm does not bear on tempering their use of force.

as an inmate, he lacks the resources to locate the defendants. Dkt. No. 51.

While the undersigned understands the difficulties Estrada faces as an inmate, it remains the Plaintiff's responsibility to ensure that the Defendants are properly served with the summons and complaint. *See generally* FED. R. CIV. P. 4(c)(1). Estrada admits that he is unable to serve the remaining Defendants with his Complaint. The undersigned sees no reason to prolong this case by retaining these defendants, and therefore recommends that the claims against these defendants be dismissed without prejudice.

## VI.  CONCLUSION

For the reasons above, the undersigned RECOMMENDS that the Court GRANT Defendant Norton and Langdon's Motion for Summary Judgment on Qualified Immunity, and DISMISS Estrada's claims against these Defendants with prejudice. The undersigned also RECOMMENDS that the Court DISMISS Estrada's claims against Defendants Broadus, Melton, Delatorre, Ramos, and Puga without prejudice for failure to prosecute.

## VII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing

before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VIII. CASE TRANSFER

The Clerk is directed to transfer this case to the docket of District Court Judge James Wesley Hendrix for further proceedings, and number this case Civil Action No. 1:22-CV-00073-H.

ORDERED this 16th day of October 2025.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE